# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Pablo Ramon Guerrero,

Petitioner

v.

Brian E. Williams, et al.,

Respondents

Case No. 2:13-cv-00328-JAD-DJA

**Order Denying Petition
for Habeas Relief and
Closing Case**

[ECF Nos. 26, 120]

Petitioner Pablo Ramon Guerrero was found guilty of burglary, preventing or dissuading a victim from reporting a crime, sexual assault, conspiracy to commit burglary, two counts of burglary while in possession of a firearm, conspiracy to commit kidnapping, first-degree kidnapping while using a deadly weapon, first-degree kidnapping while using a deadly weapon resulting in substantial bodily harm, conspiracy to commit murder, attempted murder while using a deadly weapon resulting in substantial bodily harm, conspiracy to commit robbery with use of a deadly weapon, robbery with use a deadly weapon, and grand larceny in Nevada State Court and sentenced to a total of 30 years to life.[1]  In a twenty-two count petition, Guerrero seeks a writ of habeas corpus under 28 U.S.C. § 2254 based on claims that his trial counsel was ineffective.[2]  I now address these claims on their merits.  I find that habeas relief is not warranted, so I deny Guerrero's petition, deny him a certificate of appealability, and close this case.

---

[1] ECF Nos. 37-10, 39-3, 41-4.

[2] ECF No. 26.

**Background**

**A.      The facts underlying Guerrero's conviction**[3]

Guerrero and his wife, Brenda Gallardo, separated in May 2001, and Brenda took their two children, four-year-old Pablito and ten-month-old Anthony, to live with her parents and sisters, the Gallardos.  On November 6, 2001, Guerrero called Brenda at 1:30 a.m., asking whether Brenda was talking to other men.  Brenda denied the accusations, and around 9:00 a.m., Guerrero showed up at the Gallardo residence, where Brenda, Pablito, and Anthony were alone.

Guerrero confronted Brenda with her cell phone bill and asked her who she had been calling.  When Brenda denied that she had been speaking to other men, Guerrero punched her in the face, causing her to fall to the floor in front of Pablito.  Brenda asked Guerrero to leave, and when he refused, she ran to the kitchen to call the police.  Guerrero grabbed the telephone from Brenda and removed the batteries.

Following this altercation, Guerrero's friend and codefendant, Eriberto Leon, arrived at the residence wearing black gloves.  While Leon entertained Pablito, Guerrero told Brenda that he would leave if she had sexual intercourse with him.  Brenda agreed.  Following the sexual encounter, Brenda asked Guerrero to leave, but Guerrero indicated that he lied before about leaving.  Brenda ran to the front door, but Guerrero tackled her.

Guerrero had originally told Brenda that he was going to take her and the kids to Mexico, but after Brenda insisted that the children were too young, Guerrero agreed to pick up Brenda's sister Sonia Gallardo from high school to babysit the children.  Guerrero bound Brenda's feet and hands, covered her mouth with duct tape, and put her in her parents' van.  Guerrero, who had

---

[3] These facts are taken from Brenda Gallardo's, Sonia Gallardo's, and Guerrero's testimony at Guerrero's trial.  ECF Nos. 36-9, 36-10, 37-2, 37-3.  For simplicity's sake, I cite to these exhibits generally for this entire background section.

a gun on his lap, and Brenda then drove to Sonia's school, picked Sonia up, and drove back to the residence. During the drive back to the residence and while the vehicle was parked in the garage, Sonia tried to persuade Guerrero that Brenda still loved him. Guerrero responded that he was going to take Brenda to Tijuana, Mexico, where she was going to learn how to love him again.

Guerrero demanded that Sonia retrieve Brenda's cellular telephone. Leon, who had been watching the children, escorted Sonia into the residence to retrieve the phone. Leon gave the cell phone to Guerrero, and Brenda told Sonia to go inside and lock the doors. Guerrero gave Leon some instructions, including to meet him at a casino in Primm, Nevada, in about an hour, and he left in the van with Brenda. Leon then entered the locked residence, ordered Sonia upstairs, forced her to the ground, covered her face with a baby blanket, and shot her in the head. Sonia survived and, after learning that the telephone cords had been cut, jumped off a balcony and went to a neighbor's residence to ask for help.

Meanwhile, Guerrero drove to the desired meeting place in Primm, Nevada, but when Leon failed to arrive, Guerrero started driving into California. During the drive, Brenda spoke to her mother; Guerrero's sister, Maricela Guerrero; and a detective on her cell phone and learned that Sonia had been shot. Law enforcement eventually started following the van, and Guerrero told Brenda that he was going to shoot them both when he stopped. On the detective's recommendation, Brenda turned off the van's ignition while it was still moving, and while Guerrero was turning it back on, Brenda grabbed the gun on his lap, ran to the back of the van, and threw it out the window. When the van became disabled by roadway spikes, Guerrero pulled the vehicle over and was arrested.

After Brenda and Sonia testified to these events at trial, Guerrero testified. He stated that he purchased a gun for protection after his condominium was burglarized and purchased rope and tape from Wal-Mart at 4:00 a.m. on November 6, 2001, for his landscaping job. Guerrero said that he had Leon drop him off at the Gallardo residence on the morning of November 6, 2001, so that he could speak with Brenda, and he asked Leon to pick him back up in two hours. He claimed that, after Guerrero questioned Brenda about her telephone bill, Brenda started screaming and Guerrero hit her. Guerrero claimed that he did not leave when Brenda asked him to "because [he] knew that if [he] left, that she was going to just try to make up a lie to cover whatever up."

After Leon arrived at the residence, Guerrero suggested that he entertain Pablito while Guerrero and Brenda talked. It was at this point that Guerrero suggested that they take a trip to California with the children. Brenda rejected Guerrero's suggestion and told him to leave, but Guerrero knew that "if [he] went home, that she was going to make up something, a lie and everything." Guerrero then explained that Brenda initiated sexual intercourse so that he would leave. Guerrero was hesitant but accepted the offer because he felt guilty for hitting her earlier in the morning.

After the sexual encounter, Guerrero told Brenda to pack up some of her clothes so that they could go to California, but she refused, so Guerrero "grabbed the clothes from her closet [him]self and [he] put them on the bed." Guerrero asked for Brenda's cellular telephone, but she refused and "tried to run to the door." Guerrero "tried to close the door in front of her . . . and she fell to the ground." Guerrero and Brenda then agreed to go to California without the children and to pick Sonia up from school so that she could babysit. While Guerrero and Brenda were in her parents' van in the garage prior to leaving to pick up Sonia, Guerrero asked Leon to bring

him the bag of Wal-Mart supplies, the gun, and a big knife. "Since [Brenda] wouldn't shut up, . . . [Guerrero] put tape on her mouth and . . . tied her ankles together."

After arriving back at the residence with Sonia and getting Brenda's cellular telephone and her clothing, Guerrero and Brenda left in the van. Guerrero saw Leon get into Guerrero's vehicle and leave at the same time so that they could meet at the preselected casino. But when Leon did not arrive at the location in Primm, Nevada, Guerrero started driving to California, which was when Maricela told them by telephone that Sonia had been shot. Guerrero testified that he did not stop the van even though law enforcement was following him "[b]ecause [he] was paranoid because [he] didn't know what [he] was going to do." Guerrero claimed that Brenda threw the gun out of the window so that he would not get into trouble.

**B.    Procedural history**

Following a jury trial, Guerrero's judgment of conviction was entered on March 31, 2004.[4] Guerrero appealed, and the Nevada Supreme Court affirmed in part, reversed in part, and remanded the matter to the state district court.[5] The Nevada Supreme Court reversed Guerrero's conviction for conspiracy to commit robbery because the state district court erroneously used the deadly-weapon enhancement.[6] The state district court entered an amended judgment of conviction pursuant to the Nevada Supreme Court's order on August 15, 2005.[7]

---

[4] ECF No. 39-3.

[5] ECF No. 11-4.

[6] *Id.* at 15–16.

[7] ECF No. 41-4.

Guerrero filed a proper person state habeas petition on June 6, 2006.[8]  The state district court appointed counsel, who filed a supplemental petition on April 12, 2007.[9]  After an evidentiary hearing, the state district court denied the petition on November 23, 2011.[10]  The Nevada Supreme Court affirmed the denial of the petition on January 16, 2013.[11]  Remittitur issued on February 12, 2013.[12]

Guerrero's federal habeas petition was filed on April 1, 2013.[13]  Guerrero filed a counseled, first amended petition on May 17, 2013, and a counseled, second amended petition on December 16, 2013.[14]  The respondents moved to dismiss Guerrero's second amended petition on May 22, 2014.[15]  On May 19, 2015, I granted the motion, in part, finding that Grounds 1–10, 12–14, and 16–22 were unexhausted and that only a portion of Ground 15 was exhausted; and I stayed this action pending final resolution of Guerrero's state post-conviction proceedings.[16]

---

[8] ECF No. 42.

[9] ECF No. 27-9.

[10] ECF No. 27-17.

[11] ECF No. 27-20.

[12] ECF No. 27-21.

[13] ECF No. 6.

[14] ECF Nos. 9, 26.

[15] ECF No. 64.

[16] ECF No. 78 at 8.

Guerrero filed a counseled, second state habeas petition on September 8, 2015.[17]  The state district court dismissed that petition on January 26, 2016.[18]  The Nevada Supreme Court affirmed the dismissal on June 15, 2017,[19] and remittitur issued on July 13, 2017.[20]

Guerrero moved to reopen his federal habeas case on July 20, 2017.[21]  I granted the motion and lifted the stay on August 3, 2017.[22]  The respondents again moved to dismiss Guerrero's second amended petition on December 18, 2017.[23]  On August 23, 2018, I granted the motion, in part, finding that Grounds 12, 17, and 22 were dismissed as noncognizable; Grounds 1, 2, 3, 13, 14, 18, and 21 were dismissed as procedurally barred; all claims in Grounds 15 and 16 were dismissed as procedurally barred except the ineffective-assistance-of-counsel claims; decisions on Grounds 4-10, 19, 20, and the trial-ineffective-assistance-of-counsel claims in Grounds 15 and 16 were deferred; and Ground 4(1) was unexhausted.[24]  Guerrero voluntarily abandoned Ground 4(1).[25]  The respondents answered the remaining grounds in Guerrero's second amended petition on March 15, 2019,[26] and Guerrero replied on July 29, 2019.[27]

In Guerrero's remaining grounds for relief, he alleges the following instances of ineffective assistance of counsel in violation of his federal constitutional rights:

---

[17] ECF No. 88-5.

[18] ECF No. 88-12.

[19] ECF No. 88-25.

[20] ECF No. 88-26.

[21] ECF No. 79.

[22] ECF No. 82.

[23] ECF No. 87.

[24] ECF No. 98 at 12–13.

[25] ECF No. 103.

[26] ECF No. 109.

[27] ECF No. 117.

4.      His trial counsel failed to conduct a complete investigation.

5.      His trial counsel failed to move to sever his trial from his co-defendant's trial.

6.      His trial counsel failed to inform the state district court that he was going to testify to avoid any *Bruton* issues and to allow him to present exculpatory evidence.

7.      His trial counsel failed to adequate prepare for trial.

8.      His trial counsel failed to properly prepare him to testify at trial and failed to competently present his side of the story through his testimony.

9.      His trial counsel failed to object at critical moments during trial.

10.     His trial counsel failed to object to erroneous jury instructions that shifted the burden of proof or lessened the State's burden of proof as to each element of the crimes charged beyond a reasonable doubt.

11.     His trial counsel failed to request a jury instruction on his theory of defense regarding the sexual assault charges.

15.     His trial counsel failed to object to improper jury instructions, failed to join in on a proffered instruction offered by the co-defendant, and failed to proffer an instruction on Guerrero's theory of defense on the sexual assault charge.

16.     His trial counsel failed to object to Leon's trial counsel's closing argument and cross-examination of him.

19.     His trial counsel unreasonably put him on the stand without adequate preparation and pursued an unreasonable theory of defense and argument.

20.     His trial counsel failed to challenge Leon's theory of defense and failed to investigate allegations that Leon was a gang-member.[28]

On October 22, 2019, Guerrero requested that I take judicial notice of his underlying state appeal-court filings.[29] The respondents moved to strike Guerrero's request.[30]

---

[28] ECF No. 26 at 21–147.

[29] ECF No. 119.

[30] ECF No. 120.

**Discussion**

**A.    Legal standards**

    *1.    Review under the Antiterrorism and Effective Death Penalty Act (AEDPA)*

        If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[31]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[32]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[33]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[34]  The "objectively unreasonable" standard is difficult to satisfy;[35] "even 'clear error' will not suffice."[36]

---

[31] 28 U.S.C. § 2254(d).

[32] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[33] *White v. Woodall*, 134 S. Ct. 1697, 1705–07 (2014).

[34] *White*, 134 S. Ct. 1705–06.

[35] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[36] *Wood v. McDonald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

9

Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[37] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[38] "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[39] AEDPA "thus imposes a 'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[40]

If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim de novo.[41] The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[42] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[43]

---

[37] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[38] *Id.* at 103.

[39] *Id.* at 101.

[40] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[41] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[42] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[43] 28 U.S.C. § 2254(e)(1).

## 2. *Standard for evaluating an ineffective-assistance-of-counsel claim*

The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[44] Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[45] In the hallmark case of *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show that: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case;[46] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[47]

A reasonable probability is "probability sufficient to undermine confidence in the outcome."[48] Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[49] "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom."[50] The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions.[51]

---

[44] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[45] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 335–36 (1980)).

[46] *Strickland*, 466 U.S. at 690.

[47] *Id.* at 694.

[48] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

[49] *Strickland*, 466 U.S. at 689.

[50] *Harrington*, 562 U.S. at 104.

[51] *Id.*

11

The United States Supreme Court has described federal review of a state supreme court's decision on an ineffective-assistance claim as "doubly deferential."[52] So, I "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'"[53] And I consider only the record that was before the state court that adjudicated the claim on its merits.[54]

**B.    Evaluating Guerrero's remaining claims**

I previously found that, except for a portion of Ground 15, Grounds 1–10 and 12–22 were unexhausted.[55]  I then granted Guerrero's stay and abeyance.[56]  After Guerrero filed a second state habeas petition and appealed the denial of that petition, the Nevada Supreme Court determined that his second state habeas petition was untimely and successive and thus procedurally barred.[57]  Guerrero contends that the default should be excused under *Martinez v. Ryan*[58] because he received ineffective assistance of post-conviction counsel.[59]

To establish cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule.[60]  In

---

[52] *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

[53] *Id.*

[54] *Id.* at 181–84.

[55] ECF No. 78 at 5.

[56] *Id.* at 8.

[57] ECF No. 88-25 at 2.

[58] *Martinez v. Ryan*, 566 U.S. 1 (2012).

[59] *See* ECF No. 98 at 6 (citing ECF No. 95 at 5-10).

[60] *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also McCleskey v. Zant*, 499 U.S. 467, 497 (1991) ("For cause to exist, the external impediment . . . must have prevented [the] petitioner from raising the claim."); *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) ("To establish prejudice resulting from a procedural default, a habeas petitioner bears 'the burden of showing not merely that the errors [complained of] constituted a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of

*Martinez*, the United States Supreme Court ruled that ineffective assistance of post-conviction

counsel may serve as cause to overcome the procedural default of a claim of ineffective

assistance of trial counsel.[61] The Court noted that it had previously held in *Coleman v.*

*Thompson* that "an attorney's negligence in a postconviction proceeding does not establish

cause" to excuse a procedural default.[62] But the *Martinez* Court "qualif[ied] *Coleman* by

recognizing a narrow exception: [i]nadequate assistance of counsel at initial-review collateral

proceedings may establish cause for a prisoner's procedural default of a claim of ineffective

assistance at trial."[63] The Court described "initial-review collateral proceedings" as "collateral

proceedings [that] provide the first occasion to raise a claim of ineffective assistance of trial."[64]

Because *Martinez* cannot save non-ineffective-assistance-of-trial-counsel claims, I

dismissed Grounds 1, 2, 3, 13, 18, 21, the trial-court-error claims in Grounds 15 and 16, and the

ineffective-assistance-of-appellate-counsel claims in Grounds 14, 15, and 16.[65] I also dismissed

Grounds 12, 17, and 22 as noncognizable and dismissed the remainder of Ground 14 as

duplicative.[66] With the exception of Ground 11, which is subject to disposition on the merits, the

underlying merits of the remaining Grounds—4, 5, 6, 7, 8, 9, 10, 15, 16, 19, and 20—are

intertwined with the *Martinez* analysis, so I deferred ruling on the *Martinez* issue until the merits

---

constitutional dimension." (emphases in original), citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

[61] 566 U.S. at 9.

[62] *Id.* at 15 (citing *Coleman v. Thompson*, 501 U.S. 722 (1991)).

[63] *Id.* at 9.

[64] *Id.* at 8.

[65] ECF No. 98 at 7.

[66] *Id.* at 4, 8.

were briefed by the parties.[67]  I now discuss these twelve claims in the order in which they were made.

### 1.    *Ground 4*[68]

In Ground 4, Guerrero argues that his trial counsel failed to conduct a complete investigation.[69]  He contends that trial counsel should have investigated the McDonald's employees in Primm, Nevada, to determine whether they could have testified that Brenda did not appear to be in distress when Guerrero went through the drive-through line to get food while he waited for Leon; investigated the employees at a gas station in Baker, California, to determine whether they could have testified that Brenda did not appear to be in distress while he was pumping gasoline and that Guerrero was talking on the phone with the detective for approximately 15 minutes; investigated the lack of a t-shirt found in the van, which would have disputed Brenda's testimony that she vomited into a t-shirt while the van was in the McDonald's drive-through line; investigated Brenda and Guerrero's mental health; investigated Guerrero's coworkers to see if they could provide positive character testimony; and investigated Guerrero's work records and time cards to show that he had approximately $400.00 and, therefore, no need to rob the Gallardo residence.[70]

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[71]  And "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the

---

[67] *Id.* at 10.

[68] It is noted that Guerrero voluntarily abandoned Ground 4(1).  ECF No. 103.

[69] ECF No. 26 at 21.

[70] *Id.* at 24–29.

[71] *Strickland*, 466 U.S. at 691.

14

circumstances, applying a heavy measure of deference to counsel's judgments."[72] This investigatory duty includes investigating the defendant's "most important defense,"[73] and investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence.[74] When the record demonstrates that trial counsel was well-informed, and the defendant fails to provide what additional information would have been gained by the investigation he now claims was necessary, an ineffective assistance claim fails.[75]

> ### a. McDonald's and gas-station employee testimony refuting Brenda's distress

Brenda testified that she did not try to get the attention of anyone at McDonald's because Guerrero had "warned [her] that if [she] tried to get help, that to remember that [Leon] had [her] oldest son with him."[76] In fact, Guerrero showed Brenda that the Gallardo residence key was no longer attached to the vehicle keys, indicating to Brenda that Leon had a key to the Gallardo residence.[77] Similarly, Brenda testified that she did not try to get assistance during their stop in Baker, California, because Guerrero "warned [her] not to try to get help."[78] Because Brenda did not attempt to signal that she was in distress at either the McDonald's or the gas station, Guerrero fails to show prejudice regarding his trial counsel's alleged failure to investigate whether

---

[72] *Id.*

[73] *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994).

[74] *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

[75] *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).

[76] ECF No. 37-2 at 15–16.

[77] *Id.* at 15.

[78] *Id.* at 18.

employees at either of these locations could have testified that Brenda was not in distress.[79] Brenda also testified that Guerrero spoke to Sergeant Cervantes on the telephone.[80] Thus, further testimony that Guerrero was speaking on the telephone while at the gas station was unnecessary and would not have affected the outcome of Guerrero's trial.[81]

### b.    The t-shirt

Brenda testified that she was "[o]n the floor in the back [of the van] throwing up in a t-shirt" while the van was in the McDonald's drive-through line.[82] An investigation into the lack of a t-shirt being found in the van may have impeached this portion of Brenda's testimony. However, it cannot be concluded that this relatively minor point would have affected the outcome of Guerrero's trial.[83]

### c.    Mental-health and character evidence

Guerrero argues that an evaluation of Brenda would have shown that she had a tendency to overdramatize certain things and that an evaluation of his mental health would have shown that he would not have ordered his family members to be harmed and robbed.[84] Guerrero's trial counsel testified at the post-conviction evidentiary hearing that, although they "discussed that [Brenda] had suicidal tendencies," he did not remember a psychological exam of Brenda "being

---

[79] *Strickland*, 466 U.S. at 694.

[80] ECF No. 37-2 at 17.

[81] *Strickland*, 466 U.S. at 694.

[82] ECF No. 37-2 at 16.

[83] *Strickland*, 466 U.S. at 694; *see also Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) (concluding that any "failures regarding impeachment of [the witness] are of comparatively little consequence").

[84] ECF No. 26 at 28.

an issue that was ever raised between" himself and Guerrero.[85] Although trial counsel was aware that Brenda may have had some mental-health issues, Guerrero fails to meet his burden of demonstrating that the result of his trial would have been different had his trial counsel requested such evaluations of Brenda or himself. Indeed, it is bald speculation that these evaluations would have been favorable to Guerrero and would have impeached Brenda's testimony and explained his state of mind.[86]

Likewise, it is pure speculation that Guerrero's coworkers would have potentially offered positive character testimony or that any such character evidence—or evidence showing that Guerrero had approximately $400.00—would have affected the outcome of Guerrero's trial.[87] Evidence "plac[ing] Guerrero in a much better light before the jury"[88] would not change the fact that Guerrero admitted to his participation in many of the events that took place on November 6, 2001.

Because Guerrero has not shown prejudice, Ground 4 is not substantial and Guerrero has not demonstrated that his post-conviction counsel was ineffective. And because Guerrero's post-conviction counsel was not ineffective, there is no cause for Guerrero's procedural default.[89] Ground 4 is denied as procedurally defaulted.

---

[85] ECF No. 48-8 at 34.

[86] *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("[P]rejudice is not established by mere speculation.").

[87] *Strickland*, 466 U.S. at 694.

[88] ECF No. 26 at 29.

[89] *See Martinez*, 566 U.S. at 9.

17

## 2. Grounds 5 and 6

In Ground 5, Guerrero argues that his trial counsel should have moved to sever his trial from Leon's trial.[90] Guerrero elaborates that, because the cases were not severed, he was prevented from presenting evidence inculpating Leon due to Leon's *Bruton* objections.[91] Guerrero explains that if the trials had been separated, he would have been able to present evidence that he did not know that Leon robbed the Gallardo residence or intended to shoot Sonia and would not have been harshly cross-examined by Leon's trial counsel.[92] Similarly, in Ground 6, Guerrero asserts that his trial counsel failed to inform the state district court before the trial started that Guerrero was going to testify in order to avoid any *Bruton* issues.[93]

In *Bruton v. United States*, the Supreme Court held that the admission at trial of a non-testifying codefendant's confession that explicitly implicated the defendant violated the defendant's Sixth Amendment right to confront and cross-examine the witnesses against him.[94] Guerrero alleges that, due to *Bruton* issues, he was unable to introduce through Maricela's testimony that Guerrero was surprised to learn that Sonia had been shot, to introduce through Brenda's testimony that Guerrero had written letters to Brenda that implicated Leon, and also to introduce through Brenda's testimony that Guerrero was surprised to learn that Sonia had been

---

[90] ECF No. 26 at 30. Although the Nevada Supreme Court did not address the joinder of the trials in the context of an ineffective-assistance-of-counsel claim, it did address the underlying substantive claim in Guerrero's direct appeal. ECF No. 56 at 13–15.

[91] *Id.* at 36.

[92] *Id.* at 38.

[93] *Id.* at 42.

[94] 391 U.S. 123, 137 (1968); *see also Zafiro v. United States*, 506 U.S. 534, 539 (1993) ("[A] defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial.").

shot.[95]  But Guerrero was prevented from introducing this evidence for reasons other than *Bruton*.

First, during Guerrero's cross-examination of Maricela, he attempted to ask her about a telephone call that she had with Brenda during the vehicle chase.[96]  A hearing was held outside the presence of the jury wherein Leon's trial counsel explained that there would be a *Bruton* issue regarding Guerrero's reaction to hearing that Maricela told Brenda that Sonia got shot.[97]  The state district court found that Leon's trial counsel's argument "ha[d] no merit . . . whatsoever" but limited Maricela to only testifying to what Brenda said as an excited utterance exception to the hearsay rule; in other words, Maricela was prohibited from mentioning anything about Guerrero's reaction or "anything about [Leon]."[98]

Second, during Guerrero's trial counsel's cross-examination of Brenda, Guerrero's trial counsel attempted to introduce the letters that Guerrero wrote to Brenda that implicated Leon.[99]  The state district court ruled that he was "not going to get the letters in.  It's hearsay."[100]  Guerrero's trial counsel then explained that he intended to use the letters to rebut the State's questions to Brenda on direct examination that Guerrero asked Brenda to drop some of the charges against him.[101]  The state district court then ruled that the letters could be used for the purpose of bringing out the "passage in there where he asks her or suggests to her that she drop

---

[95] ECF No. 26 at 31–36.

[96] ECF No. 37 at 112.

[97] *Id.* at 113, 120.

[98] ECF No. 37-1 at 1–2.

[99] ECF No. 37-2 at 37.

[100] *Id.*

[101] *Id.*

the charges and what will happen," but he warned that Guerrero's counsel could not "ask her about anything than just this."[102]

Third, during Guerrero's trial counsel's cross-examination of Brenda, Guerrero's trial counsel attempted to ask Brenda how she learned that Sonia had gotten shot.[103] The jury was excused, and Guerrero's trial counsel explained that, like with Maricela, he was attempting to get Brenda to explain that Guerrero was surprised to learn that Sonia had gotten shot when Maricela explained this fact to Brenda on the telephone.[104] However, when Guerrero's trial counsel asked Brenda if "it [was] true that [the telephone call from Maricela] was the first time [Brenda] had heard that Sonia had been shot," Brenda responded that it was not.[105] Guerrero's trial counsel responded, "[t]hat's news to me."[106]

Accordingly, because Maricela's testimony was limited on hearsay grounds, the letters Guerrero wrote to Brenda were also limited on hearsay grounds, and Brenda's testimony about Guerrero's reaction to learning that Sonia had been shot was not limited by the state district court but by the change in Brenda's testimony, there were no *Bruton* issues. Indeed, the state district court explained that it did not "think there's any *Bruton* issue that keeps coming up."[107] Therefore, Guerrero has failed to demonstrate that his trial counsel was deficient for failing to move for a severance of the trials based on *Bruton* concerns or for failing to alert the state district court before the trial began that Guerrero was going to testify in order to avoid any *Bruton*

---

[102] *Id.* at 37–38.

[103] ECF No. 37-2 at 35.

[104] *Id.*

[105] *Id.*

[106] *Id.* at 36.

[107] *Id.*

issues.[108]  The former part of this conclusion is also supported by Guerrero's trial counsel's

testimony at the post-conviction evidentiary hearing that he "didn't think a severance would fly"

because Guerrero and Leon "were so intertwined" and, in other cases he had defended, a motion

for severance was never fruitful due to the State's "complete store of the crime theory."[109]

Because Guerrero has not shown that his trial counsel was deficient, Grounds 5 and 6 are

not substantial, so Guerrero has not shown that his post-conviction counsel was ineffective.  And

because Guerrero's post-conviction counsel was not ineffective, there is no cause for Guerrero's

procedural default.[110]  Grounds 5 and 6 are denied as procedurally defaulted.

### 3.    Ground 7

In Ground 7, Guerrero asserts that his trial counsel failed to adequately prepare for

trial.[111]  He claims that his trial counsel should have (a) spoken to Brenda concerning the letters

she wrote to Guerrero while he was in jail, not his investigator, who turned Brenda against

Guerrero; (b) interviewed and subpoenaed Detective Rogers to testify about Guerrero's police

interview; (c) confronted Brenda with her police interview statement which differed from her

trial testimony regarding whether she or Guerrero requested that she bring her cellular telephone

on their trip; (d) confronted Sergeant Cervantes about his conversations with Guerrero in which

Guerrero explained why he kidnapped his wife and about his interview with Leon in which

Sergeant Cervantes suggested the conspiracy theory to Leon; and (e) confronted Detective

---

[108] *Strickland*, 466 U.S. at 690; *see generally Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004) ("We may grant habeas relief on a joinder challenge only if the joinder resulted in an unfair trial. There is no prejudicial constitutional violation unless simultaneous trial of more than one offense . . . actually rendered petitioner's state trial fundamentally unfair and hence, violative of due process" (internal quotation marks and citations omitted)).

[109] ECF No. 48-8 at 22, 26, 29, 40.

[110] *See Martinez*, 566 U.S. at 9.

[111] ECF No. 26 at 44.

Rodriguez about the motives for his questions to Guerrero during his police interview and about the fact that Guerrero denied knowing anything about the robbery of the Gallardo residence or attempted murder of Sonia.[112]

### a. Interviewing Brenda

Guerrero's trial counsel testified at the post-conviction hearing that he "didn't talk to [Brenda]. That wouldn't be [his] place. [He did not] think that would be ethical."[113] Instead, Guerrero contends that his trial counsel sent his investigator to speak with Brenda and that his investigator turned Brenda against him by stating that Guerrero told Leon to shoot Sonia.[114] Guerrero provides no support for the latter part of this contention. So Guerrero has failed to demonstrate that his trial counsel's investigator made inappropriate comments or that his trial counsel's ethical concerns regarding interviewing Brenda personally amounted to a deficiency.[115]

### b. Detective Rogers

Although Detective Rogers did not testify at the trial, Detective Roger's partner, Detective Maurice Rodriguez, did testify.[116] Because Detective Rogers and Detective Rodriguez interviewed Guerrero together,[117] Guerrero has failed to demonstrate why his trial counsel needed to subpoena Detective Rogers and thus has not shown that trial counsel was deficient.[118]

---

[112] *Id.* at 44–70.

[113] ECF No. 48-8 at 34.

[114] ECF No. 26 at 44.

[115] *Strickland*, 466 U.S. at 690.

[116] *See* ECF No. 37-1 at 12.

[117] *See* ECF No. 32-1 at 11.

[118] *Strickland*, 466 U.S. at 690.

### c. *Brenda's cell phone*

Turning next to Guerrero's contention that his trial counsel should have confronted Brenda with her police interview statement that conflicted with her trial testimony concerning who requested the cellular telephone, Guerrero claims that it was important for the jury to know that he was the one who actually convinced Brenda to get the cellular telephone in order to keep in contact with Brenda's parents.[119] This, Guerrero argues, demonstrated his concern for Brenda's family and refuted the evidence that he stole from the family and intended for Sonia to get hurt.[120]

Guerrero's contention lacks merit. Brenda testified at trial that she "convinced [Sonia] to get out of the car and [Guerrero] asked for [Brenda]'s cell phone. [Brenda] thought it was a better idea to have it with [her and Guerrero]; so, [she] told Sonia where it was."[121] Because Brenda's testimony at trial supported the fact that Guerrero requested the cellular telephone, a fact that he wanted the jury to know, Guerrero fails to demonstrate that his trial counsel was deficient.[122]

### d. *Failure to cross examine Sergeant Cervantes*

Next, Guerrero asserts that his trial counsel should have cross-examined Sergeant Cervantes about his conversations with Guerrero during the vehicle chase (in which Guerrero explained why he kidnapped Brenda) and also about his interview with Leon (in which Cervantes allegedly suggested the conspiracy theory to Leon).[123] Sergeant Alfredo Cervantes

---

[119] ECF No. 26 at 60.

[120] *Id.* at 61.

[121] ECF No. 37-2 at 13.

[122] *Strickland*, 466 U.S. at 690.

[123] ECF No. 26 at 62.

23

testified that he obtained Brenda's cellular telephone number from her parents and called it many times during the afternoon and evening of November 6, 2001, while Guerrero and Brenda were driving.[124]  Guerrero eventually answered that phone.[125]  Sergeant Cervantes and Guerrero had several "lengthy conversations" in which Sergeant Cervantes "tr[ied] to empathize, sympathize with [Guerrero] in whatever he had done."[126]  Later, during the vehicle chase, Sergeant Cervantes spoke with Guerrero on the cellular telephone again "to empathize with him and try to get him to stop and surrender."[127]  Guerrero's trial counsel did not cross-examine Sergeant Cervantes about the substance of these conversations with Guerrero,[128] which Guerrero claims would have shown that they discussed Guerrero's need for counseling, his ability to take parenting classes after this incident was over, and the reasons why he decided to kidnap his wife.[129]

But Guerrero testified at the trial and explained on several occasions that he was taking Brenda to California so that they could have some alone time in order to work on their relationship.[130]  Because the jury was aware that Sergeant Cervantes was attempting to sympathize with Guerrero during these cellular telephone conversations, and because Guerrero was able to testify about his state of mind and the reasons behind his actions during the trial,

---

[124] ECF No. 37-2 at 52, 54.

[125] *Id.* at 54.

[126] *Id.* at 54–55.

[127] *Id.* at 56.

[128] *Id.* at 58.

[129] ECF No. 26 at 62–63.

[130] *See, e.g.,* ECF No. 37-3 at 17.

Guerrero has not shown that his trial counsel's lack of cross-examination about Sergeant Cervantes's conversations with Guerrero amounted to a deficiency.[131]

Guerrero's trial counsel also did not cross examine Sergeant Cervantes about the techniques he used during his police interview with Leon.[132] However, outside the presence of the jury, Leon's trial counsel asked Sergeant Cervantes about his interview with Leon, and Sergeant Cervantes explained that he asked Leon questions about Leon being ordered to shoot Sonia and being afraid of Guerrero in order "to elicit information from him as to get him to admit that he shot Sonia."[133] The state district court disallowed this testimony before the jury.[134] Guerrero fails to demonstrate that, had *his* trial counsel sought to introduce this line of questioning, as opposed to *Leon's* trial counsel, that the state district court would have allowed it. Therefore, Guerrero fails to demonstrate that his trial counsel was ineffective.[135]

> d.    *Failure to cross examine Detective Rodriguez*

Finally, Guerrero argues that his trial counsel should have cross-examined Detective Rodriguez about the fact that he was instructed by Sergeant Cervantes to extract admissions that Guerrero was in charge of Leon and ordered him to kill Sonia and about the fact that Guerrero denied knowing anything about the robbery of the Gallardo residence or attempted murder of Sonia.[136] Guerrero's trial counsel cross-examined Detective Rodriguez about the fact that a sexual-assault physical examination was not performed on Brenda, the fact that the charges

---

[131] *Strickland*, 466 U.S. at 690.

[132] ECF No. 37-2 at 58.

[133] *Id.* at 59.

[134] *Id.* at 60.

[135] *Strickland*, 466 U.S. at 690, 694.

[136] ECF No. 26 at 66–67.

Guerrero was being held on in California were dropped, and about the inconsistencies in Detective Rodriguez's declaration of arrest.[137]  Guerrero's trial counsel did not question Detective Rodriguez about his interview with Guerrero.[138]  Detective Rodriguez's declaration of arrest reports that Guerrero "did not admit to telling Eddie to shoot Sonia" and that "he did not take any jewelry from Brenda's parents' bedroom."[139]  Although Guerrero's trial counsel could have asked Detective Rodriguez about these statements in his report, Guerrero fails to demonstrate that the result of his trial would have been different if he had.[140]  Guerrero testified consistent with these points, so the jury was already aware that Guerrero was denying culpability for the robbery and attempted murder.

Because Guerrero has not shown that his trial counsel was deficient regarding portions of Ground 7 and has not shown prejudice regarding the remainder of Ground 7, Ground 7 is not substantial.  Guerrero has thus not shown that his post-conviction counsel was ineffective.  And because Guerrero's post-conviction counsel was not ineffective, there is no cause for Guerrero's procedural default.[141]  Ground 7 is denied because it is procedurally defaulted.

### 4.    *Grounds 8 and 19*

In Ground 8, Guerrero asserts that his trial counsel failed to properly prepare him to testify at trial and to competently present his side of the story through his testimony.[142]  In Ground 19, he claims that his trial counsel unreasonably put him on the stand without adequate

---

[137] ECF No 37-1 at 12, 40–41, 60.

[138] ECF No. 37-2 at 40–42, 60.

[139] ECF No. 32-1 at 11.

[140] *Strickland*, 466 U.S. at 694.

[141] *See Martinez*, 566 U.S. at 9.

[142] ECF No. 26 at 70.

preparation and pursued an unreasonable theory of defense that Brenda had a propensity for being untruthful.[143] Guerrero also argues that his trial counsel should have moved to suppress his statements to the police because he was intoxicated and had been awake for four days at the time of his interview.[144]

a.     *Failure to prepare Guerrero to testify*

First, regarding Guerrero's argument that his trial counsel failed to adequate prepare him to testify, the state district court explained to Guerrero his constitutional rights regarding testifying and the potential consequences of testifying.[145] During that colloquy, Guerrero answered in the affirmative when asked if had "discussed with [his] lawyer[] whether or not [he] want[ed] to take the witness stand."[146] Later, during Leon's trial counsel's cross-examination of Guerrero, the state judge recessed, and outside the presence of the jury, the following discussion took place between the state district and Guerrero's trial counsel:

> THE COURT:     . . . We had an earlier meeting outside the presence of the jury with [Guerrero's trial counsel] and the rest of the attorneys from the State.   The Court was inquiring of [Guerrero's trial counsel] what his strategy was in this case in putting his client on the stand. [Guerrero's trial counsel], would you tell the Court your strategy behind this method?
>
> [COUNSEL]:     Your Honor, I don't know if we're going to settle - - I spent a lot of time last night preparing for what I anticipated being closing today.  This is obviously a very difficult case. I think [Leon's trial counsel] - - well, articulated prior to this case, there has been no offers in this case.   I'm basically attempting to minimize the damage.   I have alternative suggested jury instructions.

---

[143] *Id.* at 140.

[144] *Id.* at 146.

[145] ECF No. 37-3 at 3.

[146] *Id.*

| | | |
|---|---|---|
| THE COURT: | | I know. I understand that. You're trying to minimize damages. Is that why you put your client on? |
| [COUNSEL]: | | That was a conscious decision between myself [sic]. In another case in this Eight Judicial District. |
| THE COURT: | | Before we get there - - you can explain later, but it was your conscious decision to do what? |
| [COUNSEL]: | | To have him explain away some of the State's case in the last four days. |
| THE COURT: | | So, as I understand it correctly, you decided and it was strategically a decision on your part to put him on the stand and have him testify to all the things that he did on that particular date; is that correct? |
| [COUNSEL]: | | That is correct. |
| THE COURT: | | He agreed to that? |
| [COUNSEL]: | | I do agree, and he agrees with that. |
| THE COURT: | | Is that right, sir? |
| GUERRERO: | | Yes. |
| THE COURT: | | Even though you're admitting a lot of the State's allegations, you still wanted to do that? That was your agreement with him in order to minimize some of the charges against you to show that they weren't true? |
| [COUNSEL]: | | You have to answer the judge. |
| GUERRERO: | | I didn't really understand. |
| THE COURT: | | [Guerrero's trial counsel], form what [Guerrero's trial counsel] told me, he solicited certain testimony from you to show that some of the charges were not accurate that you've been charged with and that you weren't guilty of some of those charges. |
| GUERRERO: | | That's true. |
| THE COURT: | | And that's what you were trying to do by getting on the stand; is that correct? |

28

| | |
|---|---|
| GUERRERO: | Yes. |
| THE COURT: | And that, in fact, is your strategy, [Guerrero's trial counsel]? |
| [COUNSEL]: | That's correct, your Honor. |
| THE COURT: | All right. Now, [Guerrero's trial counsel], as the Court stated to you earlier about [Leon's trial counsel]'s testimony, what is your strategy in reference to that? |
| [COUNSEL]: | Your Honor, I think there were a couple of objectionable questions, and I was busy with my notes and I will pay attention a little more. I'm not sure whose side [Leon's counsel] is on at this point. |
| THE COURT: | Of course, he's on his client's side. That's his job to represent his client. |
| [COUNSEL]: | Sure. |
| THE COURT: | And your job is to represent your client. |
| [COUNSEL]: | That's correct. |
| THE COURT: | Which I don't have any problems with, but - - |
| [COUNSEL]: | I don't have any problem with him doing his job. |
| THE COURT: | I don't know if you guys have a joint defense or what the defense is, but I just want to put on the record the earlier discussions that we had and that sort of thing. . . .[147] |

Guerrero's trial counsel later testified at the post-conviction evidentiary hearing that it was a joint decision for Guerrero to take the stand at trial.[148] He explained that he and Guerrero rehearsed Guerrero's trial testimony in the jail "for a few hours at a time" on "numerous" occasions.[149] During those conversations, Guerrero's trial counsel advised Guerrero on the

---

[147] ECF No. 37-3 at 28–29.

[148] ECF No. 48-8 at 22, 25.

[149] *Id.* at 25, 30–31.

ramifications of taking the stand.[150]  Even with that preparation, Leon's trial counsel "ambushed

him [on cross-examination, which] was a complete surprise to [Guerrero's trial counsel] . . . as

well to Mr. Guerrero."[151]  Guerrero's trial counsel explained that Guerrero "was like a deer in the

headlights" and that he "honestly thought that [Guerrero] would have handled cross-examination

better but he didn't."[152]  Guerrero's counsel also explained that he and Guerrero felt that it was

necessary for him to testify because they "had no one there to tell his side of the story" and

"thought [they] would knock out a couple of counts" with his testimony by "try[ing] to explain

away some of the stuff that basically Leon did [as being] outside of [the] scope and outside of

[Guerrero's] knowledge."[153]

Clearly, Guerrero's testimony did not go as planned.  Indeed, the state district court

paused the proceedings during Leon's trial counsel's cross-examination of Guerrero to question

Guerrero's trial counsel about his strategy in having his client testify.[154]  And Guerrero's trial

counsel confirmed that Guerrero did not handle cross-examination well.[155]  However, these facts

do not lead to a conclusion that Guerrero's trial counsel was deficient.[156]  Rather, Guerrero's trial

counsel explained several times that he met with Guerrero on numerous occasions to prepare his

testimony.[157]  Even if Guerrero's trial counsel was deficient for failing to prepare Guerrero

---

[150] *Id.* at 25, 26.

[151] *Id.* at 25.

[152] *Id.* at 25, 32.

[153] *Id.* at 26–28, 33.

[154] ECF No. 37-3 at 28–29.

[155] ECF No. 48-8 at 25, 32.

[156] *Strickland*, 466 U.S. at 690.

[157] *Id.* at 25, 30–31.

adequately, Guerrero fails to demonstrate prejudice.[158]  Guerrero's trial counsel explained that he thought "the same result would have resulted had [Guerrero] not taken the stand" because there "was just so much overwhelming evidence" and "it was just a tough case."[159]  Guerrero fails to prove otherwise.

### b.     The Brenda-had-a-propensity-for-violence theory of defense

Next, Guerrero contends that his trial counsel pursued an unreasonable theory of defense that Brenda had a propensity for violence.  While this may have been a point that the defense pointed to during trial, it appears that Guerrero's trial counsel's main defense was that Guerrero did not know about or participate in the attempted murder of Sonia.  In fact, Guerrero's trial counsel testified that their defense was that Guerrero did not know about the attempted murder, which they tried to prove by "separat[ing Guerrero] and Leon through [Guerrero's] testimony."[160]  Accordingly, Guerrero fails to demonstrate a deficiency.[161]

### c.     Failure to move to suppress police interview

Finally, Guerrero contends that his trial counsel should have moved to suppress his police interview statements because they were involuntary due to his intoxication.  Guerrero testified that he had been "out smoking weed and drinking the night before" the incident and that he did not sleep that night "because [he] was so worried" about Brenda lying.[162]  Guerrero also testified that he had been awake for "like two-and-a-half days" at the time his gave his statement

---

[158] *Id.* at 694.

[159] ECF No. 48-8 at 51, 65.

[160] ECF No. 48-8 at 27–28, 33.

[161] *Strickland*, 466 U.S. at 690.

[162] ECF No. 37-3 at 12, 23.

to the police.[163]  Brenda also testified that Guerrero "smoked some marijuana" during one of their stops in California following her kidnapping.[164]

At the post-conviction evidentiary hearing, Guerrero's trial counsel testified that he did not contemplate attempting to suppress Guerrero's statements because he had not seen a statement be found "inadmissible because [a defendant] didn't know what he was saying."[165]  To be sure, the admission into evidence at trial of an involuntary statement violates a defendant's right to due process under the Fourteenth Amendment.[166]  However, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[167]  Although a defendant's mental state is a "significant factor in the 'voluntariness' calculus,'" it "does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'"[168]  Because Guerrero fails to allege any police coercion, his trial counsel's decision not to file a motion to suppress his statement based on its alleged involuntariness was not deficient.[169]

---

[163] *Id.* at 41.

[164] ECF No. 37-2 at 18, 40.

[165] ECF No. 48-8 at 53.

[166] *Lego v. Twomey*, 404 U.S. 477, 478 (1972); *Jackson v. Denno*, 378 U.S. 368, 376 (1964) ("It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession"); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (explaining that the requirement that *Miranda* rights be given prior to a custodial interrogation does not dispense with a due-process inquiry into the voluntariness of a confession).

[167] *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

[168] *Id.* at 164.

[169] *Strickland*, 466 U.S. at 690.

Because Guerrero has not shown that his trial counsel was deficient, Grounds 8 and 19 are not substantial, so Guerrero has not shown that his post-conviction counsel was ineffective. And because Guerrero's post-conviction counsel was not ineffective, there is no cause for Guerrero's procedural default.[170] Grounds 8 and 19 are denied because they are procedurally defaulted.

### 2. Grounds 9 and 16

In Ground 9, Guerrero argues that his trial counsel failed to object seventeen critical times during Leon's trial counsel's cross-examination of him.[171] Similarly, in Ground 16, Guerrero argues that his trial counsel failed to object to seven instances during Leon's trial counsel's cross-examination of him and other witnesses, and five points during his closing argument.[172] Some of Guerrero's contentions in Ground 9 overlap with his contentions in Ground 16.

First, Guerrero takes issue with the following italicized questions posed to him by Leon's trial counsel during cross-examination:

> Q. I thought you told the jury that Eddy woke you up?
>
> A. Eddy did wake me up.
>
> Q. *He wasn't with you, you magically dropped him off*?
>
> A. I dropped him off like around 11:00 or 12:00 at his girlfriend's house.
>
> . . .

---

[170] *See Martinez*, 566 U.S. at 9.

[171] ECF No. 26 at 74–79.

[172] *Id.* at 124–28. I previously dismissed the remainder of the claims in Ground 16. *See* ECF No. 98 at 13.

| | | |
|---|---|---|
| 1 | Q. | In that 92 pages [of the police interview], you give a multitude of different versions about what happened that day, don't you? |
| 3 | A. | Yes, I did. |
| 4 | Q. | And the versions you tell the police officers, those are different than the version you told the people of the jury today, right? |
| 6 | A. | Yes. |
| 7 | Q. | *Did you think you were supposed to lie to the cops when you were giving this statement?* |
| 8 | A. | No, but I was confused and I didn't know - - I couldn't remember the way things happened that night. |
| 9 | . . . | |
| 10 | A. | . . . Every husband is jealous when it comes to his wife. |
| 11 | Q. | *Every husband hog-ties his wife and he's jealous, is that what you're telling me*? |
| 12 | A. | I think hog-tie is when you tie somebody's hands behind their back and I didn't do that. |
| 13 | Q. | *You seem to know a lot about tying people up. How did you tie her*? |
| 15 | A. | Just her ankles, and I put tape around her mouth. |
| 16 | . . . Q. | You wanted to shut her up? |
| 17 | A. | That's because she kept screaming at me, yes. |
| 18 | Q. | *She shouldn't do that, right after you punch her in the face, right? She shouldn't have the right to yell at you*? |
| 19 | A. | Well, she had a right to yell at me, I guess. |
| 20 | . . . A. | The night before she promised me that she wasn't talking to anybody else, and I asked her to promise me and hope for me to die that she wasn't talking to nobody else. |
| 22 | Q. | *By talking to nobody else, this is after you put her out of the house, she wasn't allowed to talk to any men, right*? |

34

| | | |
|---|---|---|
| A. | | We were still together, that's why, and we had made an agreement that we would get back together as soon as we work everything out that we were going through, the little things that we were going through. They were stupid things. |
| Q. | | *According to Brenda, you told her you had been having relations with a girl at Burger King, right?* |
| A. | | That's what she said but that's not true. |
| . . . | | |
| Q. | | Let me show you what's been entered as State's exhibit 129. It's a certified copy of the phone bill. Why don't you tell the jury where that phone bill goes to as the billing address? |
| A. | | It says 1518 Juniper Twig. |
| Q. | | That's not your house, is it? |
| A. | | No, it's not, but what's the date on that phone bill? |
| Q. | | *This is a certified copy of Brenda's phone bill and the date is January 2, 2002.* |
| A. | | Exactly. This happened in November. |
| . . . | | |
| Q. | | *But she's not allowed to talk to men even though you threw her out of the house?* |
| A. | | That's because we're still together, we're still married. |
| Q. | | But you can see who you want to see? |
| A. | | I wasn't seeing anybody. There's no proof of that. |
| Q. | | *Brenda must be lying, huh?* |
| A. | | I don't know why that came up. |
| . . . | | |
| Q. | | You had been to the service? |
| A. | | Yes. |
| Q. | | *In the service in basic training, this Navy basic training that you went to, they teach you to punch women in the face?* |

| | | |
|---|---|---|
| 1 | A. | No. There's a domestic violence - - |
| 2 | Q. | Answer my question. |
| 3 | COURT: | Counsel, you're being argumentative. |
| | | . . . |
| 4 | Q. | *In this Navy basic training, they teach you to take 16-year-old kinds with you to watch your children while you're going to beat your wife*? |
| 5 | | |
| 6 | A. | No. |
| 7 | COURT: | What did I just tell you, [Leon's trial counsel]? If you can't ask the questions properly, you're not going to be allowed to ask any more questions. |
| 8 | | |
| | | . . . |
| 9 | Q. | *You told the police officers that you had never hit Brenda before November 6th, 2001, correct*? |
| 10 | A. | That's true. |
| 11 | Q. | Is that your testimony today? |
| 12 | A. | I never hit her before. That's still true. That time that I did hit her was the only time that I ever hit her before. |
| 13 | | |
| | Q. | *Why did she leave the house six months earlier?* |
| 14 | | |
| | A. | Because we were having arguments and stuff like that about me being with my friends a lot and stuff like that and her not being able to - - |
| 15 | | |
| 16 | | |
| | COURT: | Excuse me. That's irrelevant. |
| 17 | | . . . |
| | A. | I love my wife. |
| 18 | | |
| | Q. | *What part of what you did November 6th, in your mind, indicates being in love with your wife - - punching her in the face?* |
| 19 | | |
| 20 | A. | No. |
| 21 | Q. | Tying her up? |
| 22 | A. | No. |
| 23 | Q. | *Threatening to kill your kids*? |
| | A. | I never did that. |

36

| | Q. | *Beating her in front of your kids?* |
|---|---|---|
| | A. | I did not mean to do that. |
| | Q. | What part of any of those acts constitutes love, in your mind? |
| | A. | In the eyes of everybody else, none. |
| | | . . . |
| | Q. | *So you were lying to the jury earlier when you said that you were asking people to do things, you were ordering this young man - -* |
| | A. | No. |
| | Q. | *- - to take your orders, weren't you?* |
| | A. | No.[173] |

Second, Guerrero takes issue with questions posed by Leon's trial counsel to Steve Odum, Maricela, and Sergeant Cervantes. Steve Odum, the Gallardos' neighbor, testified about assisting Sonia after she came to his residence following being shot.[174] During cross-examination, Leon's trial counsel asked Odum it if "appeared that Sonia knew one of the individuals."[175] Odum answered in the affirmative and then confirmed that Guerrero—and, by default, not Leon—was the "only name [he] refer[red] to" in his testimony and to the 911 operator.[176] Next, Leon's trial counsel asked Maricela if she "gave information to the police officers, and then . . . came to court [and] testified, at least in part, to try to help [her] brother?"[177] Last, Leon's trial counsel attempted to question Sergeant Cervantes about

---

[173] ECF No. 37-3 at 23–30.

[174] ECF No. 36-10 at 20.

[175] *Id.* at 22.

[176] *Id.*

[177] ECF No. 37-1 at 10.

37

conversations Leon had with detectives, during which Leon allegedly indicated his fear of Guerrero; however, the state district court held a hearing outside the presence of the jury and disallowed the questions.[178] Prior to the hearing outside the presence of the jury, Leon's trial counsel asked Sergeant Cervantes, "You told [the prosecutor] about a conversation that you had had when Detective Martines and Arojo and Mr. Leon was present?"[179]

Third, Guerrero takes issue with five comments Leon's trial counsel made during his closing argument. Leon's trial counsel argued that Leon had nothing to do with stealing the Gallardos' jewelry; that "Leon [was] not the principal anywhere on November 6th, 2001"; that "[t]he facts in this case about the shooting are far from as clear" because Detective Rodriguez wrote in his report that "Sonia had told somebody that [Guerrero] shot her. And then she told them that [Leon] shot her"; that "mere presence and companionship before and after in and of itself is not sufficient to support a conviction"; and that he was "the one that questioned Brenda and Sonia in . . . a non-offensive fashion to get them to tell [the jury] what happened that day, and [he was] the one that went after [Guerrero] to get him to tell [the jury] what happened that day."[180]

### a.  *Failure to object to questioning of Guerrero*

To be sure, as Guerrero contends, many of Leon's trial counsel's cross-examination questions to Guerrero were argumentative, for example, asking whether Guerrero thought he should lie to the police, whether Guerrero knew a lot about tying people up, and whether Guerrero learned to beat his wife in basic training. Guerrero also argues that his trial counsel

---

[178] ECF No. 37-2 at 59–60.

[179] *Id.* at 59.

[180] ECF No. 37-4 at 35–39.

should have objected to Leon's trial counsel's question about Guerrero having relations with another woman on relevancy grounds, the presentation of the copy of Brenda's cellular telephone bill on the ground that the date was misstated, and the implied references that Guerrero had hit Brenda on earlier occasions on the basis that it was an uncharged act.[181]  Because Guerrero's trial counsel later testified that Guerrero did not handle cross-examination very well and was blindsided by some of Leon's trial counsel's questions,[182] it can be concluded that Guerrero's trial counsel's failure to object to these questions fell below an objective standard of reasonableness.[183]  Indeed, Guerrero's trial counsel explained that "there were a couple of objectionable questions, and [he] was busy with [his] notes and [would] pay attention a little more."[184]  So, even though "[a]n attorney's failure to object to the admission of inadmissible evidence is not necessarily ineffective,"[185] that does not appear to be the case here.

But this deficiency alone is not enough.  Guerrero fails to demonstrate that the result of his trial would have been different had his trial counsel made these objections.[186]  During direct examination, Guerrero admitted that he committed the acts charged with the exception of sexually assaulting Brenda and participating in the attempted murder of Sonia.[187]  So Guerrero's character was already strained before these argumentative questions were even posed.  Plus,

---

[181] The state district court previously ruled that the State was prohibited from questioning Brenda about why she left the marital residence because it alluded to an uncharged crime of domestic violence. *See* ECF No. 37-2 at 38.

[182] ECF No. 48-8 at 25, 32.

[183] *Strickland*, 466 U.S. at 690.

[184] ECF No. 37-3 at 28–29.

[185] *Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1991) ("We need not determine the actual explanation for trial counsel's failure to object, so long as his failure to do so falls within the range of reasonable representation.").

[186] *Strickland*, 466 U.S. at 694.

[187] *See* ECF No. 37-3 at 8-23.

Guerrero's trial counsel testified at the post-conviction evidentiary hearing that, because the state district court disallowed Leon's duress jury instruction, he believed that the impact of Leon's trial counsel's cross-examination of Guerrero was minimal or none because he was not able to later argue anything duress related.[188]

> ### b. Failure to object to Leon's counsel's questions to other witnesses

Guerrero fails to demonstrate deficiency regarding to the questions posed by Leon's trial counsel to Odum, Maricela and Sergeant Cervantes.[189] Leon's trial counsel's question to Odum about Guerrero's name being the only one that Sonia mentioned was proper based on the facts of the case. In fact, Sonia testified that she had never met Leon and did not know his name.[190] Next, Leon's trial counsel's question about Maricela's reason for testifying was also proper.[191] And contrary to Guerrero's urging, the jury heard no evidence about Sergeant Cervantes's theory that Leon was fearful of Guerrero because the state district court immediately held a hearing outside the presence of the jury following an innocuous question posed by Leon's trial counsel.[192] Because Guerrero fails to demonstrate that the testimony "would not have been admissible" had his trial counsel not failed to object to its admission,[193] Guerrero's claim lacks merit.

---

[188] ECF No. 48-8 at 60.

[189] *Strickland*, 466 U.S. at 690.

[190] ECF No. 36-10 at 15.

[191] *See Reynoso v. Giurbino*, 462 F.3d 1099, 1115 (9th Cir. 2006) (explaining that the "failure to cross-examine [a] witness about their motivation for testifying as they did . . . [is] unreasonable").

[192] ECF No. 37-2 at 59–60.

[193] *United States v. Bosch*, 914 F.2d 1239, 1246–47 (9th Cir. 1990).

1            *c.     Failure to object to closing argument*

2          With respect to Leon's trial counsel's closing argument, Guerrero again fails to

3     demonstrate deficiency.[194]  First, Leon's trial counsel arguments were based on inferences that

4     could be drawn from the evidence presented at the trial.[195]  Second, the jury was instructed that

5     "[s]tatements, arguments and opinions of counsel are not evidence."[196]  Finally, as Guerrero's

6     trial counsel pointed out at the post-conviction evidentiary hearing, Leon's trial counsel

7     primarily attacked the pleadings in his closing argument.[197]  Thus, even if Leon's trial counsel's

8     arguments were improper, they were relatively minor statements compared to the bulk of the

9     closing argument itself.

10         Because Guerrero has not shown that his trial counsel was deficient—or, in the instances

11    in which his trial counsel was deficient, has not shown prejudice—Grounds 9 and 16 are not

12    substantial, so Guerrero has not shown that his post-conviction counsel was ineffective.  And

13    because Guerrero's post-conviction counsel was not ineffective, there is no cause for Guerrero's

14    procedural default.[198]  Grounds 9 and 16 are denied because they are procedurally defaulted.

15        **3.    *Grounds 10, 15(2), and 15(3)***

16         In Ground 10, Guerrero argues that his trial counsel failed to object to Jury Instructions

17    10, 16, 17, and 18, which shifted or lessened the State's burden of proof to prove each element of

18

19

---

20    [194] *Strickland*, 466 U.S. at 690.

21    [195] *See, e.g., Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (concluding that an improper closing argument did not infect the trial with unfairness because arguments "were supported by the evidence and reasonable inferences that could be drawn from the evidence").

22    [196] ECF No. 37-7 at 13.

23    [197] ECF No. 48-8 at 50.

[198] *See Martinez*, 566 U.S. at 9.

the crimes charged beyond a reasonable doubt.[199]  In Ground 15(2), Guerrero argues that Jury

Instruction Nos. 10 and 17 failed to properly instruct the jury on the specific intent elements of

first-degree kidnapping and attempted murder.[200]  And in Ground 15(3), Guerrero argues that

Jury Instruction No. 18 did not inform the jury that, in order for him to be convicted of the

deadly weapon enhancement on the kidnaping and attempted-murder charges related to Sonia, he

must have had either actual or constructive possession of Leon's weapon.[201]

      The jury was instructed as follows regarding intent and conspiracy and aiding and

abetting:

| | |
|---|---|
| Jury Instruction No. 9: | Conspiracy is an agreement or mutual understanding between two or more persons to commit a crime. To be guilty of conspiracy, a defendant must intend to commit, or to aid in the commission of, the specific intent agreed to. The crime is the agreement to do something unlawful; it does not matter whether it was successful or not. |
| Jury Instruction No. 10: | Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if the act or the declaration is in furtherance of the object of the conspiracy. The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. Every conspirator is legally responsible for an act of a co-conspirator that follows as one of the probable and natural consequences of the object of the conspiracy even if it was not intended as part of the original plan and even if he was not present at the time of the commission of such act. |

---

[199] ECF No. 26 at 80–81.

[200] *Id.* at 112, 115.

[201] *Id.* at 116.

| | | |
|---|---|---|
| Jury Instruction No. 16: | Where two or more persons are accused of committing a crime together, their guilt may be established without proof that each personally did every act constituting the offense charged. All persons concerned in the commission of a crime who either directly and actively commit the act constituting the offense or who knowingly and with criminal intent aid and abet in its commission or, whether present or not, who advise and encourage its commission, with the intent that the crime be committed, are regarded by the law as principals in the crime thus committed and equally guilty thereof. A person aids and abets the commission of a crime if he knowingly and with criminal intent aids, promotes, encourages or instigates by act or advice, or by act and advice, the commission of such crime with the intention that the crime be committed. The State is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted. | |

Jury Instruction No. 17:    Where two or more persons join together in a common design to commit any unlawful act, each is criminally responsible for the acts of his confederates committed in furtherance of the common design. In contemplation of law, the act of one is the act of all.

. . .

Jury Instruction No. 18:    The participation of a defendant not actually in possession of the weapon by aiding or abetting the actual user in the unlawful use of the weapon, makes a defendant equally subject to the added weapon enhancement available to the user who commits a crime through the use of a deadly weapon.[202]

### a.    Jury Instructions 10, 16, and 17

The State charged Guerrero with the first-degree kidnapping of Brenda and Sonia and with the attempted murder of Sonia under either a conspiracy or an aiding-and-abetting theory of

---

[202] ECF No. 37-7 at 16, 22–23, 25.

criminal liability.[203]  Guerrero was found guilty of these charges.[204]  The jury's reliance on a particular theory of liability is unclear.[205]

Prior to Guerrero's trial, "aiders and abettors [we]re criminally responsible for all harms that [we]re a natural, probable, and foreseeable result of their actions."[206]  Approximately a year before Guerrero's trial, the Nevada Supreme Court stepped back from this test and, in *Sharma v. State*, narrowed the definition of aiding and abetting by holding that "in order for a person to be held accountable for the specific intent crime of another under an aiding or abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the charged crime."[207]  The Nevada Supreme Court clarified in *Sharma* that it was "disavow[ing] and abandon[ing] the [natural and probable consequences] doctrine."[208]  Pertinently, attempted murder and first-degree kidnapping are specific-intent crimes.[209]

---

[203] ECF No. 37-5 at 5–7.

[204] ECF No. 37-10 at 4–6.

[205] *Cf. Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) ("A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one.").

[206] *Mitchell v. State*, 971 P.2d 813, 820 (Nev. 1998), *overruled in relevant part by Sharma v. State*, 56 P.3d 868, 872 (Nev. 2002).

[207] *Sharma*, 56 P.3d at 872.

[208] *Id.*; *see also Bolden v. State*, 124 P.3d 191, 200-01 (Nev. 2005) (holding that "a defendant may not be held criminally liable for the specific intent crime committed by a coconspirator simply because that crime was a natural and probable consequence of the object of the conspiracy"), *overruled on other grounds by Cortinas v. State*, 195 P.3d 315, 324 (Nev. 2008).

[209] *See Keys v. State*, 766 P.2d 270, 273 (Nev. 1988) ("Attempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill."); *Bolden*, 124 P.3d at 201.

Guerrero's argument focuses on the fact that a petitioner's due-process rights are violated if a jury instruction "ha[s] the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind."[210] So the issue here is whether Guerrero's trial counsel was ineffective in failing to object to the jury instructions because, when analyzed as a whole, the jury instructions ran afoul of *Sharma* by eliminating the requirement that the jury find that Guerrero had the requisite intent to commit first-degree kidnapping and attempted murder.

Jury Instruction No. 10's language that "[e]very conspirator is legally responsible for an act of a co-conspirator that follows as one of the probable and natural consequences of the object of the conspiracy" appears to endorse the natural-and-probable-consequences doctrine, which was disavowed a year before Guerrero's trial.[211] So Guerrero's trial counsel's failure to challenge this instruction "fell below an objective standard of reasonableness."[212] But Guerrero fails to demonstrate that the result of his trial would have been different had his trial counsel challenged the instruction.[213] Indeed, Jury Instruction Nos. 9 and 16 properly required a finding that Guerrero possessed the requisite intent established in *Sharma*. Jury Instruction No. 9 advised that, "[t]o be guilty of conspiracy, a defendant must intend to commit, or to aid in the commission of, the specific intent agreed to," and Jury Instruction No. 16 provided that "[a]ll persons concerned in the commission of a crime who . . . knowingly and with criminal intent aid

---

[210] *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979); *see also In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *Evanchyk v. Stewart*, 340 F.3d 933, 939 (9th Cir. 2003) ("It is a violation of due process for a jury instruction to omit an element of the crime.").

[211] *See Sharma*, 56 P.3d at 872.

[212] *See Strickland*, 466 U.S. at 688.

[213] *Id.* at 694.

and abet in its commission or . . . who advise and encourage its commission, with the intent that the crime be committed, are regarded by the law as principals."[214]

### b. Jury Instruction No. 18

Prior to Guerrero's trial, in *Anderson v. State*, the Nevada Supreme Court generally stated that "the participation of a defendant not actually in possession of the weapon by aiding and abetting the actual user in the unlawful use of the weapon, makes the former equally subject to the added penalty inflicted upon defendants who commit crimes through the use of deadly weapons."[215] This general statement mirrors Jury Instruction No. 18.[216] But the Nevada Supreme Court in *Anderson* also stated that "the possession necessary to justify statutory enhancement may be actual or constructive; it may be exclusive or joint" and "[c]onstructive or joint possession may occur only when the unarmed participant has knowledge of the other offender's being armed, and where the unarmed offender has . . . the ability to exercise control over the firearm."[217] This remained the law in Nevada until 2008, after Guerrero's trial.[218] Because Jury Instruction No. 18 merely stated *Anderson*'s generic principle but failed to include

---

[214] ECF No. 37-7 at 15, 22.

[215] *Anderson v. State*, 600 P.2d 241, 243 (Nev. 1979), *abrogated by Brooks v. State*, 180 P.3d 657 (Nev. 2008).

[216] *See* ECF No. 37-7 at 25.

[217] *Anderson*, 600 P.2d at 244.

[218] *See Brooks*, 180 P.3d at 661 (rejecting *Anderson*'s constructive possession test and "conclud[ing] that an unarmed offender 'uses' a deadly weapon and therefore is subject to a sentence enhancement when the unarmed offender is liable as a principal for the offense that is sought to be enhanced, another principal to the offense is armed with and uses a deadly weapon in the commission of the offense, and the unarmed offender had knowledge of the use of the deadly weapon").

the constructive-possession test, it appears that Guerrero's trial counsel was deficient in failing to remedy the error.[219]

But because the facts demonstrate that Guerrero had constructive possession of Leon's firearm, Guerrero fails to demonstrate prejudice.[220] Brenda testified that, before Guerrero tied her up in the van, he directed Leon to get his gun, which he had left in a bush in front of the residence.[221] At first Leon could not locate the gun, but after Guerrero again explained where he had hidden it, Leon found it and gave it to Guerrero.[222] Guerrero then asked Leon, "'Do you have your gun?' and [Leon] nodded yes and patted his pocket."[223] Importantly, Brenda also testified that both guns were Guerrero's.[224] Because Guerrero had knowledge that Leon was armed and because Guerrero exercised control over Leon and his firearm, thereby meeting the constructive-possession test in *Anderson*, Guerrero fails to demonstrate that it is reasonably probable that, but for trial counsel's error in failing to correct Jury Instruction No. 18, the result of his trial would have been different.[225]

Because Guerrero has not shown prejudice regarding his trial counsel's deficiencies regarding Jury Instruction Nos. 10 and 18, Grounds 10, 15(2), and 15(3) are not substantial. Thus, Guerrero has not shown that his post-conviction counsel was ineffective. And because Guerrero's post-conviction counsel was not ineffective, there is no cause for Guerrero's

---

[219] *See Strickland*, 466 U.S. at 688.

[220] *Id.* at 694.

[221] ECF No. 37-2 at 11.

[222] *Id.*

[223] *Id.*; *see also* ECF No. 37-3 (testimony of Guerrero that both guns were in the trunk of his vehicle prior to the incidents).

[224] ECF No. 37-2 at 45.

[225] *Strickland*, 466 U.S. at 694.

procedural default.[226]  Grounds 10, 15(2), and 15(3) are denied because they are procedurally defaulted.

### 4. *Grounds 11 and 15(5)*

In Grounds 11 and 15(5), Guerrero argues that his trial counsel failed to request a jury instruction on his theory of defense regarding the sexual-assault charges.[227]  Guerrero asserts that his trial counsel should have requested the following mistaken-belief-of-consent jury instruction:

> It is a defense to a charge of sexual assault that the Defendant entertained a reasonable and good faith belief that the female person voluntarily consented to engage in sexual intercourse. If from all the evidence you have a reasonable doubt whether the Defendant reasonably and in good faith believed she voluntarily consented to engage in sexual intercourse, you must give the Defendant the benefit of that doubt and find him not guilty of said charge. A belief that is based upon ambiguous conduct by an alleged victim that is the product of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another is not a reasonable good faith belief.[228]

In Guerrero's appeal from the denial of his first state habeas petition, the Nevada Supreme Court rejected this theory, concluding that he had failed to show deficiency or prejudice:

> [A]ppellant argues that his trial counsel was ineffective for failing to propose a jury instruction defining consent, failing to argue that the instructions did not inform the jury that a victim must resist for the sexual act to not have been consensual.  Appellant argues that, had the jury been properly instructed, it would have concluded that the victim actually consented to the sexual assault as the victim did not physically or mentally resist appellant.  Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced.

---

[226] *See Martinez*, 566 U.S. at 9.

[227] ECF No. 26 at 85, 120.

[228] *Id.* at 86 (citing *Honeycutt v. State*, 56 P.3d 362 (Nev. 2002)).

There was overwhelming evidence that the sexual act occurred against the victim's will or under conditions in which appellant new or should have known that the victim was mentally or physically incapable of resisting. *See Shannon v. State*, 105 Nev. 782, 790, 783 P.2d 942, 947 (1989) (citing NRS 200.366). The circumstances surrounding the sexual act in this case demonstrate that appellant used physical force against the victim and threats of physical force against the victim, her children, and her parents to coerce the victim to submit to sexual intercourse. "Submission is not the equivalent of consent." *McNair v. State*, 108 Nev. 53, 57, 825 P.2d 571, 574 (1992) (citing *Tryon v. State*, 567 P.2d 290, 293 (Wyo. 1977)). Further, the evidence demonstrated that the victim reasonably manifested her opposition to engage in sexual acts under these circumstances. *See id.* (citing *Dinkens v. State*, 92 Nev. 74, 78, 546 P.2d 228, 230 (1976)). Appellant fails to demonstrate that reasonably competent counsel would have argued for further instructions regarding consent under the circumstances of this case. Moreover, as there was overwhelming evidence that the victim did not consent, appellant fails to demonstrate a reasonable probability that the outcome of the trial would have been different had counsel sought additional instructions regarding consent. Therefore, the district court did not err in denying this claim.[229]

Brenda testified that, after she let Guerrero into the residence on November 6, 2001, he attempted to initiate sexual intercourse with her, but she declined.[230] After Guerrero punched Brenda, disabled the telephone to keep her from calling the police, and told her he was taking her and the children to Mexico, Guerrero "said that if [Brenda] had sex with him, he would leave; so, [Brenda] agreed."[231] Brenda later clarified that "[she] asked what [Guerrero] wanted from [her], and if all he wanted was to have sex, and [she] said, 'If we have sex, would you leave?' And he said, 'Yes.'"[232] Brenda testified that, even though she did not resist, she did not want to have sexual intercourse with Guerrero and cried during the sexual encounter because she "was upset

---

[229] ECF No. 14-5 at 3–4.

[230] ECF No. 37-2 at 7.

[231] *Id.* at 9.

[232] *Id.*

and scared."[233]  Due to the circumstances, Brenda felt coerced to have sexual intercourse with

Guerrero.[234]  Brenda later told law enforcement what happened regarding the sexual encounter,

but at that time, she did know whether the circumstances amounted to rape.[235]  Brenda confirmed

that law enforcement did not suggest that she had been raped.[236]

Regarding the sexual encounter, Guerrero testified that Brenda "asked [him] if [he]

wanted to do it . . . and after that, will [he] go home."[237]  Guerrero indicated that he was not sure

how to proceed and responded, "'[i]f you want to, I guess it's cool,' . . . [b]ecause [he] wanted to

make it up to her because [he] love[d his] wife and [he] had never hit her before; so, [he] felt bad

about it."[238]  Guerrero testified that Brenda took her clothes off voluntarily and that although he

started to have sexual intercourse with Brenda, he stopped because his mind was not in it due to

the telephone bill.[239]

The heart of Guerrero's argument is that the district court prevented him from

establishing his defense theory by denying his proposed instruction on mistaken belief of

consent.[240]  Guerrero argues that his trial counsel was deficient for not attempting to introduce a

jury instruction on mistaken belief of consent, especially since he made a similar argument in his

---

[233] *Id.*

[234] *Id.* at 47.

[235] *Id.* at 41.

[236] *Id.*

[237] ECF No. 37-3 at 15.

[238] *Id.*

[239] *Id.* at 16.

[240] *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.").

closing argument.[241]  A review of the record, however, demonstrates that Guerrero's trial counsel did not address mistaken belief of consent in his closing argument; rather, he simply argued that Brenda and Guerrero had consensual sexual intercourse.[242]  And the jury was instructed thoroughly about consent, albeit not mistaken belief of consent.[243]

Even if Guerrero's trial counsel was deficient, the Nevada Supreme Court reasonably determined that Guerrero failed to demonstrate prejudice.[244]  While Brenda may have initiated the sexual encounter, she did so in order to get Guerrero to leave her and her children alone. Brenda was in fear of their safety in light of the fact that Guerrero had punched her, prevented her from calling the police, invited Leon over, and demanded that Brenda leave with him to Mexico.  Brenda cried during the sexual encounter.  Because the Nevada Supreme Court's determination that there was overwhelming evidence that Brenda did not consent was reasonable, its determination that Guerrero failed to demonstrate a reasonable probability that the result of his trial would have been different if his trial counsel had requested the mistaken-belief-of-consent jury instruction was also reasonable.  Guerrero is denied federal habeas relief for Grounds 11 and 15(5).

---

[241] ECF No. 117 at 11.

[242] *See* ECF No. 37-4 at 31 (Guerrero's trial counsel's closing argument comment "that there was consensual contact between these two people" and that Brenda did not believe that she had been sexually assaulted when she spoke to law enforcement).

[243] *See* ECF No. 37-7 at 34–35, 37; *see also Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (explaining that jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record" (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

[244] *Strickland*, 466 U.S. at 694.

### 5. *Ground 15*

In the remainder of Ground 15,[245] Guerrero argues that his trial counsel failed to object to improper jury instructions and failed to join in on a proffered jury instruction offered by Leon.[246] Ground 15(1) focuses on Jury Instruction No. 14, which lessened the State's burden of proof to "slight evidence" rather than "beyond a reasonable doubt" on proving the existence of a conspiracy.[247] In Ground 15(4), Guerrero argues that his trial counsel failed to object to the improper jury instructions—37, 38, and 41—on attempted murder because they lessened the State's burden of proving that Guerrero had the express malice necessary to be found guilty of attempted murder.[248] And in Ground 15(6), Guerrero argues that his trial counsel failed to join in on Leon's motion to instruct the jury on voluntary intoxication.[249]

Guerrero takes issue with the "slight evidence" language contained in the first line of Jury Instruction No. 14, which stated:

> Whenever there is slight evidence that a conspiracy existed, and that the defendant was one of the members of the conspiracy, then the statements and the acts by any person likewise a member may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the statements and acts may have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy, and in furtherance of some object or purpose of the conspiracy.[250]

---

[245] Portions of Ground 15 were discussed with Grounds 10 and 11.

[246] ECF No. 26 at 107. I previously dismissed Guerrero's ineffective-assistance-of-appellate-counsel claims and state-district-court-error claims that were also included with Ground 15. *See* ECF No. 98 at 13.

[247] ECF No. 26 at 109.

[248] *Id.* at 118.

[249] *Id.* at 122.

[250] ECF No. 37-7 at 20.

The Nevada Supreme Court has held that, "[i]n determining the admissibility of [various co-conspirator out-of-court declarations], the district court properly found the existence of a conspiracy by 'slight evidence' as required in Nevada."[251]  Although it does not appear that it was necessary to instruct the jury regarding the evidentiary threshold used to determine whether a co-conspirator's statements should be admitted, I do not conclude that Jury Instruction No. 14 was improper or confused the jury as to the State's burden of proof.  The jury was also instructed that Guerrero "is presumed innocent until the contrary is proved" and "[t]his presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense."[252]  It was also instructed that "[t]o be guilty of conspiracy, a defendant must intend to commit, or to aid in the commission of, the specific crime agreed to."[253]

I now turn to Guerrero's contention regarding the attempted-murder jury instructions—37, 38, and 41.  Jury Instruction No. 37 provided that "[a]ttempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill."[254]  Jury Instruction No. 38 defined malice aforethought:

> Malice aforethought, as used in the definition of Attempted Murder, means the intentional attempt to kill another human being without legal cause, legal excuse or what the law considers adequate provocation.  The condition of mind described as malice aforethought may rise, not alone from anger, hatred, revenge or from particular ill will, spite, or grudge toward the person killed, but may result from any unjustifiable or unlawful motive or

---

[251] *McDowell v. State*, 746 P.2d 149, 150 (Nev. 1987); *see also Peterson v. Sheriff, Clark County*, 598 P.2d 623, 624 (Nev. 1979).

[252] ECF No. 37-7 at 11.

[253] *Id.* at 15.

[254] *Id.* at 47.

purpose to injure another which proceeds from a heart fatally bent on mischief or with reckless disregard of consequences and social duty. Malice aforethought does not imply deliberation or the lapse of any considerable time between the malicious intention, but denotes rather an unlawful purpose and design in contradistinction to accident and mischance.[255]

And Jury Instruction No. 41 provided that "[e]xpress malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice may be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart."[256]

Under Nevada law, "[a]ttempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill."[257] Jury Instruction No. 37 mirrors this language and, thus, is a proper recitation of the intent required for attempted murder under Nevada law.[258] The Nevada Supreme Court has explained, however, that "[a]n instruction on implied malice in relation to the crime of attempted murder is misleading to a jury."[259] So Jury Instruction No. 41's inclusion of a definition of both express and implied malice was misleading.[260] For this reason, Guerrero's trial counsel was deficient for not objecting to the misleading nature of Jury

---

[255] *Id.* at 48.

[256] *Id.* at 51.

[257] *Keys v. State*, 766 P.2d 270, 273 (Nev. 1988).

[258] *See* ECF No. 37-7 at 47.

[259] *Keys*, 766 P.2d at 272; *see also Sharma v. State*, 56 P.3d 868, 870 (Nev. 2002) ("[A]ttempted murder can only be committed with express malice. . . . [I]mplied malice alone is insufficient to support a conviction for attempted murder.").

[260] *See* ECF No. 37-7 at 51.

54

Instruction No. 41.[261]  But Guerrero fails to demonstrate prejudice regarding this deficiency.[262] The Nevada Supreme Court, the final arbiter of Nevada law, declined to reverse a conviction in this situation "because, although the jury was improperly instructed on implied malice, it was properly instructed regarding the elements of attempted murder."[263]

Finally, I turn to the involuntary-intoxication jury instruction, which Leon proposed this way:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of his intoxication may be taken into consideration in determining such purpose, motive or intent.[264]

Leon's trial counsel argued that there was evidence that Leon was voluntarily intoxicated because he asked Guerrero during cross-examination, "isn't it true the night before, hours before this all happened, you and [Leon] had been smoking marijuana, and [Guerrero's] response was yes."[265]  After the State argued that too much time had elapsed between the alleged intoxication and the incidents, Leon's trial counsel argued, "[t]here has been no testimony offered by anybody that the effects of the marijuana had worn off."[266]  The state district court requested that the relevant testimony be provided to him, and, thereafter, he denied the instruction, explaining that "there's no evidence that [Leon] was smoking or drinking."[267]  The state district court

---

[261] *Strickland*, 466 U.S. at 690.

[262] *Id.* at 694.

[263] *Riebel v. State*, 790 P.2d 1004, 1006 (Nev. 1990).

[264] ECF No. 37-6 at 4.

[265] ECF No. 37-4 at 4.

[266] *Id.*

[267] *Id.* at 6–7.

further explained that "there's no evidence to support" the voluntary-intoxication instruction because "there is no evidence that [Leon] was intoxicated or even smoked marijuana, and the evidence is that he hadn't."[268] Indeed, the relevant testimony from Guerrero was that on the night of November 5, 2001, Guerrero was "out smoking weed and drinking" and that "[Leon] was with [him] for a moment, but then [he] dropped [Leon] off at his girlfriend's house."[269] Later, at the post-conviction evidentiary hearing, Guerrero's trial counsel testified that he "just [did]n't think the facts were there" to support a voluntary intoxication jury instruction regarding Guerrero.[270]

Guerrero fails to demonstrate that his trial counsel was deficient in this regard.[271] While Guerrero testified that he drank alcohol and smoked marijuana on the night of November 5, 2001, there was no evidence that he was still intoxicated when he arrived at the Gallardo residence at approximately 9:00 a.m. on November 6, 2001. Therefore, the facts do not show that a voluntary-intoxication instruction regarding Guerrero was warranted.

Because Guerrero has not shown that his trial counsel was deficient—or, in the instance in which he did demonstrate deficiency, failed to demonstrate prejudice—the remainder of Ground 15 is not substantial, so Guerrero has not shown that his post-conviction counsel was ineffective. And because Guerrero's post-conviction counsel was not ineffective, there is no cause for Guerrero's procedural default.[272] The remainder of Ground 15 is denied because it is procedurally defaulted.

---

[268] *Id.* at 7.

[269] ECF No. 37-3 at 23.

[270] ECF No. 48-8 at 57.

[271] *Strickland*, 466 U.S. at 690.

[272] *See Martinez*, 566 U.S. at 9.

### 6. *Ground 20*

In Ground 20, Guerrero argues that his trial counsel failed to challenge Leon's duress theory of defense.[273] Guerrero argues that Leon's trial counsel brought up Leon's duress defense several times during the trial. First, Leon's trial counsel asked Sonia questions about Leon's size compared to her size.[274] Second, Leon's trial counsel asked Brenda questions about whether Leon was following Guerrero's orders on the day of the incidents.[275] Third, Leon's trial counsel asked Sergeant Cervantes about Leon's age.[276] Fourth, Leon's trial counsel asked Guerrero questions about whether he gave orders to Leon.[277]

Later, the state district court refused to give Leon's requested jury instruction, "which state[d] that a defendant is not guilty of a crime if the defendant participated in the crime under duress."[278] The state district court explained that "the evidence was that [Leon] was a willing participant, and when [Leon] was left alone with Sonia, that [Guerrero] was nowhere around when [Leon] shot her in the face according to the evidence and testimony."[279] The state district court then went on to explain that "[t]here [was] not one iota of evidence to suggest that [Leon] was operating under duress or anything such as that; so, there's no fact in evidence that would support giving" the duress defense instruction.[280]

---

[273] ECF No. 26 at 147.

[274] ECF No. 36-10 at 17.

[275] ECF No. 37-2 at 45–46.

[276] *Id.* at 59.

[277] ECF No. 37-3 at 24, 30.

[278] ECF No. 37-4 at 2.

[279] *Id.* at 3.

[280] *Id.*

Although Leon's trial counsel elicited some testimony that Leon was following Guerrero's orders on the day of the incidents, was small in stature, and was young, those facts do not support a conclusion that Leon acted under duress. Indeed, the state district court prohibited Leon from presenting a duress jury instruction because the facts failed to support that theory of defense. Accordingly, even if Leon's trial counsel was attempting to present a duress theory of defense, he failed to do so, and Guerrero's trial counsel was not deficient for failing to challenge it.[281]

Guerrero also argues in Ground 20 that his trial counsel failed to investigate allegations that Leon was a gang member.[282] Guerrero's trial counsel testified at the post-conviction evidentiary hearing that he was never made aware of Leon's alleged gang affiliation.[283] However, even if he had known about Leon's alleged gang affiliation, Guerrero's trial counsel testified that he "definitely wasn't going to bring it up at trial" because, based on his experience, he would not want to associate Guerrero with a gang member.[284] Because Guerrero never informed his trial counsel about Leon's alleged gang affiliation and because Guerrero's trial counsel had strategic reasons for not bringing it up had he known about it, Guerrero fails to demonstrate that his trial counsel was deficient.[285]

Because Guerrero has not shown that his trial counsel was deficient, Ground 20 is not substantial, so Guerrero has not shown that his post-conviction counsel was ineffective. And

---

[281] *Strickland*, 466 U.S. at 690.

[282] ECF No. 26 at 147.

[283] ECF No. 48-8 at 22, 32.

[284] *Id.* at 32–33.

[285] *Strickland*, 466 U.S. at 690; *see also Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) ("[C]ounsel is not deficient for failing to find mitigating evidence if . . . nothing has put the counsel on notice of the existence of that evidence.").

because Guerrero's post-conviction counsel was not ineffective, there is no cause for Guerrero's procedural default.[286]  Ground 20 is denied because it is procedurally defaulted.

## C.  Certificate of Appealability

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[287]  "Where a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[288]  Because I have rejected petitioner's constitutional claims on their merits, and he has not shown that this assessment of his claims is debatable or wrong, I find that a certificate of appealability is unwarranted in this case.

### Conclusion

IT IS THEREFORE ORDERED that the second amended petition **[ECF No. 26] is DENIED**, and because reasonable jurists would not find my decision to deny this petition to be debatable or wrong, IT IS FURTHER ORDERED that **a certificate of appealability is DENIED**.

And, because Guerrero is represented by counsel, the respondents' motion to strike Guerrero's pro se request for judicial notice **[ECF No. 120] is GRANTED.  ECF No. 119 is hereby STRUCK.**

---

[286] *See Martinez*, 566 U.S. at 9.

[287] 28 U.S.C. § 2253(c).

[288] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

The Clerk of Court is directed to ENTER JUDGMENT accordingly and CLOSE THIS CASE.

Dated: April 9, 2020

_____
U.S. District Judge Jennifer A. Dorsey